UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:22-cr-00027-KAB |
| | : | |
| v. | : | June 23, 2022 |
| | : | |
| WILLIAM A. SACCO | : | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant William A. Sacco ("Billy" or "Mr. Sacco"), by and through undersigned

counsel, respectfully submits this memorandum and accompanying letters of support from

family, friends, and professional colleagues to assist the Court in determining an appropriate

sentence following his guilty plea to one count of wire fraud, in violation of 18 U.S.C. § 1343.

Based on his good character as discussed in numerous letters of support, sincere and

demonstrated remorse for his criminal conduct, and extremely low likelihood of recidivism, Mr.

Sacco respectfully requests that the Court exercise its discretion to impose a sentence of two

years probation, restitution in the amount of $41,195.85 (as agreed by the parties, and which has

already been paid) and no criminal fine. Such a sentence would best effectuate the sentencing

goals of 18 U.S.C. § 3553(a) and thus is the appropriate sentence in this case.

## PRELIMINARY STATEMENT

In evaluating how Mr. Sacco should be sentenced, the Court must use its discretion to

impose a sentence that is "sufficient, but not greater than necessary" to achieve the objectives of

criminal sentencing. *See* 18 U.S.C. § 3553(a). In so doing, the Court must consider all of the

factors set forth in 18 U.S.C. § 3553, including the defendant's history and characteristics and

the nature and circumstances of the offense. Although the United States Sentencing Guidelines

("Sentencing Guidelines") are to be considered, they cannot be substituted for this Court's

independent determination of an appropriate sentence, including consideration of all of the § 3553 factors. *See Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . . . The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable) (emphasis in original); *see also Spears v. United States*, 555 U.S. 261, 263-64 (2009). As *Nelson* and *Spears* emphasize, the Guidelines are merely advisory, and Courts should impose the least severe sentence necessary to accomplish the objectives set forth in § 3553.

The numerous letters submitted on Mr. Sacco's behalf by his family, friends, and former colleagues attest that Billy is a loving and caring father and husband, dedicated and hardworking son, and valued member of the community. Billy is enormously remorseful for his actions, as demonstrated by his prompt plea of guilty to an Information, his payment of restitution prior to sentencing using money borrowed from his family, and in the letters of family and friends.

Billy's request for a sentence of two years probation, restitution of $41,195.85, and no criminal fine balances the seriousness of his crime and the harm he caused to ███████ with the substantial mitigating circumstances present here, including the direct relationship between the offense and his addiction to pain medication, the already-severe consequences he will face as a result of this felony conviction, his sincere and immediate remorse, his extremely low likelihood of recidivism, and the harm that a prison sentence would cause to his recovery from addiction.

## I. Relevant Background and Circumstances of Billy Sacco

Billy is a 49-year-old "dedicated and loving father" described by those who know him best as being "as dependable as they come," "family oriented," and "selfless." The numerous letters of support submitted herewith paint a clear picture of a man who values family above

everything else, treats everyone with respect and kindness, and who regularly goes out of his way to support others.  Unfortunately, as a result of a significant back injury in 2004 and three surgeries in years that followed, Billy became addicted to prescription painkillers.  The shame and exorbitant cost of his addiction resulted in financial desperation that led him to have the most serious lapse in judgment of his life and commit the offense conduct in order to pay for family expenses using gifts obtained from ██████ ██████  With the support of his family and doctors, Billy has remained in recovery for the past five years and wholeheartedly takes responsibility for his actions.

### A.  Billy's Deep Connection with His Family Started in Childhood

Billy was born on January 31, 1973 in Medford, Massachusetts as the second of three children.  PSR at ¶ 62.  His parents, Dennis Lawrence Sacco and Kathleen Sacco, met as teenagers in their hometown of Medford and were married for over forty years before Dennis passed away in 2017 from cancer.  *Id.*  Billy still shares a very close relationship with his older brother, Dennis Sacco, Jr. and younger sister, Kimberly Ann Faulkoner.  *Id.* at ¶ 65. Billy's middle class childhood was pleasant and filled with love from both parents. *Id.* at ¶ 62.  His parents raised their family in North Andover, Massachusetts, and regularly took Billy and his siblings on family vacations.  *Id.*  Billy feels "his childhood could not have been better." *Id.*

Billy's hard work and dedication to family are traits inherited from his father, the Chief Operating Officer for Limbach Holdings Company, a mechanical contracting firm where he worked for over twenty years prior to his retirement.  *Id.* at ¶ 63.  Mrs. Sacco was a loving, caring, and dedicated stay-at-home mother who cared for Billy and his two siblings. *Id.* at ¶ 64.

### B.  Billy is Extraordinarily Devoted to His Family

Everyone who knows Billy Sacco knows him as a man who is dedicated to his family. Billy met his wife, Jennifer, in 1996 and she was drawn to not only his "magnetic personality,"

but also his commitment to his family.  Letter from Jennifer Sacco, attached hereto as <u>Exhibit 1</u>.

The feeling was clearly mutual.  Billy's family "loved her.  She was a ray of sunshine."  PSR at

¶ 68.  The couple married in 1998 and Jennifer converted from Protestantism to Catholicism,

deepening her already strong relationship with Billy's mother.  *Id.*  Billy and Jennifer have two

children, Taylor Shea Sacco (24 years old) and Thomas William Sacco (22 years old).  *Id.* at

¶ 69.  Throughout Taylor and Tommy's childhoods, Jennifer was a homemaker and stay-at-home

mom while Billy worked outside of the home and financially supported the family.  *Id.* at ¶ 68.

Jennifer has worked part-time doing payroll for childcare centers and is currently an assistant

manager at a yoga studio, a position for which she receives yoga classes but is not paid. *Id.*

Jennifer describes Billy as "an excellent father" who is "[k]ind, patient, and supportive."  Letter

from Jennifer Sacco, <u>Exhibit 1</u>.

Billy's devotion to his children is perhaps best summed up by his son, Thomas, who

writes,  "Prior to the day he was arrested in November, I did not have a single bad memory of my

father."  Letter from Thomas Sacco, attached hereto as <u>Exhibit 2</u>.  After high school, Thomas

joined the Local 12 plumber's union and joined Billy working at ▮▮▮▮▮▮▮▮ calling it a

"dream come true getting to drive to and from work with him and really be guided in my career

while getting to peek into what he did." *Id.*  "He has taught me more than I could have ever

asked for and at the same time been my best friend through everything."  *Id.*

Taylor Sacco emphatically echoes her brother's sentiments about their father, writing, "In

all of my 24 years, he has shown me time and time again that my brother and I are the most

important things in his life." Letter from Taylor Sacco, attached hereto as <u>Exhibit 3</u>.

> There is no one on Earth I admire and respect more than my dad,
> Billy.  I'd like to think in many ways I know and understand him
> more than anyone else.  Friends and relatives often tell me I am
> 'just like Billy,' and there is no greater compliment.  I know that

> when a person says that I am just like my father, they mean to tell me that I am selfless. They mean to tell me that I am independent and strong. Hardworking and courageous. Deeply empathetic and fiercely loyal. When a person tells me that I am just like my father, I am proud of the woman I've become.

*Id.* Taylor describes how her father "coached soccer, attended church, and even pretended to enjoy my middle school theatrical performances." *Id.* When Taylor briefly moved back home after college, Billy "packed lunches for me every day, taking extra time to make the things I liked and leaving me special notes in the fridge." *Id.*

Billy's dedication to his family is one of the first things that comes to mind to those that know him, whether they be family, longtime friends, or former coworkers. Indeed, in the attached letters of support, Billy's devotion to his family is an overwhelmingly constant refrain, as these excerpts from his sister-in-law and brother-in-law's letters demonstrate.

> Billy is a devoted husband and has raised 2 smart, responsible and wonderful children who[] are starting to make their marks in this world as young adults.

Letter from Lindsey Sargent (Billy's sister-in-law), attached hereto as <u>Exhibit 4</u>.

> Over the years, watching how [Billy] treated my sister and children has become a blueprint for me as I navigated being a husband into fatherhood. Watching how proud Billy was at every dance recital, baseball game, confirmation, communion, baptism is/was amazing. It is true to his character and love the man possesses for his family . . . . [Selflessness and generosity] are just the core values he lives by day in and day out. What is and has been perfectly clear to me over the past 25 years is his everlasting commitment as a husband, father, and brother.

Letter from Steven Sargent (Billy's brother-in-law), attached hereto as <u>Exhibit 5</u>.

Billy's grade school friends also describe how much family means to him.

- "I still remember the excitement in his voice when his first child Taylor was born, same with Tommy. After that came cartoon themed birthday parties every year depending on the kids['] favorite T.V[.] shows at the time. You could just tell that the kids meant the world to Billy and that he would do anything he could to make them happy. In spite of Billy's

admission of wrongdoing, I still have great respect for him as a person based on the many great qualities that I have witnessed firsthand over the last 35 years." Letter from Sean McGuire (Billy's childhood friend), attached hereto as <u>Exhibit 6</u>.

- "Family is the word that comes to mind when I think about Bill Sacco. His love for his wife, Jenn, and kids, Taylor and Tommy, is readily apparent every time we get together. Bill is a proud man, and his smile shows whenever he speaks about his children. Though the children are adults in their own right now, the Saccos still spend most of their free time together as a family. Whether it's trying new restaurants in Boston or drives up the coast of Maine, Bill, Jenn, Taylor and Tommy do it together, and they wouldn't have it any other way." Letter from John Erle (Billy's friend of over thirty years), attached hereto as <u>Exhibit 7</u>.

- "We spent many a year at fundraising events where he and Jenn were the organizers and promoters to gather as many of us as possible to support various needs. One of those was the small school in Haverhill where his children thrived." Letter from Ken Hannon (Billy's friend of over thirty-five years), attached hereto as <u>Exhibit 8</u>.

- "Billy has a strong and amazing marriage to his wife Jennifer, in which they are true partners and friends. He is a dedicated and loving father to his children Taylor and Tommy, who while they are both in their twenties, he has continued to show his ever-present focus on their well-being through love and compassion . . . . Having teenagers of my own who have very busy lives, seeing Taylor and Tommy constantly choose to spend time with their dad is a sign of what an important role he plays in their life." Letter from Daniel Gallagher (Billy's childhood friend), attached hereto as <u>Exhibit 9</u>.

- Billy "is a supportive and loving father and husband." Letter from John MacMillan (Billy's friend of almost forty years), attached hereto as <u>Exhibit 10</u>.

Billy's adoration for his family is also known by his former coworkers at ███████ whom Billy often counseled on the importance of spending time with family and striking a work-life balance.

- "The biggest praise I give to Bill is the fact that he was family oriented. We all saw that and he made it very clear to all of us that family always comes first. That means, when you are at work, yes work as hard as you can and do the best job possible. However, he also understood that family is important and wanted all of us to have a work and family balance. That is something I always admired about him because a lot of people tend to

lose track of family when they are so work driven. Bill was not that person and till this day I still wonder how he did it all." Letter from George Elias (former coworker), attached hereto as <u>Exhibit 11</u>.

- "It was abundantly clear that nothing was more important to him [than his family]. He sacrificed whatever he needed for them. He also never questioned anyone who requested to take care of family or simply to just spend some extra time with them." Letter from Trevor Young (former coworker), attached hereto as <u>Exhibit 12</u>.

A further example of Billy's dedication to his family is described in the support letter submitted by Billy's friend, Katherine Gallagher. In 2003, the Sacco family decided to move so that Taylor and Tommy would be in a better school district, with three months between when they moved out of their old home and the date on which their new home was available. Although the Saccos had other housing options, none allowed pets. Heartbroken at the prospect of having to abandon their dog and two cats, Billy, Jenn, Taylor, and Tommy lived together for those three months in a spare room provided by Katherine and Daniel Gallagher, longtime friends of Billy's who themselves had just welcomed a newborn baby. "Many of our family and friends voiced their opinions on how this was going to be a terrible idea (having a newborn baby, our own two dogs, and two cats) but they were wrong. It ended up being a time that we look back on to this day as some of the best days of our lives and we would do it all over again if we had to." Letter from Katherine Gallagher, attached hereto as <u>Exhibit 13</u>.

> The living conditions were not ideal for Billy, Jenny, Taylor and Tommy. Although our spare room was roomy, they were still four people living in one room. The kids had the beds and Billy and Jenny slept on an air mattress on the floor. We had three dogs and four cats running around, two young children and a newborn. [Billy] was just so happy to have everyone together and the fact that they got to keep their pets was worth every chaotic moment to him.

*Id.*

Billy is also a devoted son, not hesitating to step up when both of his parents were diagnosed with cancer. "I saw his compassion firsthand as he cared for both his parents while they dealt with cancer treatments, driving them to and from treatments or helping around their house when here in the northeast or down in Florida." Letter from Daniel Gallagher, <u>Exhibit 9</u>. In retirement, Billy's father, Dennis, spent much of his time with his grandchildren, playing with them and bringing them to activities, including spending time with them at his lake house in Maine. Dennis had been the Sacco family patriarch for decades, and his death from cancer in 2017 devastated Billy and the entire family. PSR at ¶ 63.

Fortunately, Billy's mother, Kathleen, remains in remission from breast cancer. *Id.* at ¶ 64. Billy's support of his mother after the death of his father struck a chord with multiple people in his life.

> Since the passing of his father [Billy has been] an integral part of support for his mother. When I think of selfless men and putting someone else well before yourself I think of one specific story about Billy and his mom. Billy's father passed away a few years ago and his mother was in Florida. While working, raising a family, he put his life on hold to travel to Florida to help his mother. He then drove her and her two cats from Florida back to Massachusetts.

Letter from █ Takesian, attached hereto as <u>Exhibit 14</u>. This incident resonated with Billy's sister-in-law as well. Lindsey Sargent writes, "Billy helped his mother move multiple times, after the passing of his father, and he took in her 2 kittens when she could not take them with her." Letter from Lindsey Sargent, <u>Exhibit 4</u>. Lindsey further noted that Billy "also offered a hand when my husband and I moved into 3 different homes since we have lived in the Northeast. Billy frequently house and pet-sits for my husband and I as well as for other friends when we go out of town. Whether he is bringing surprise sweet treats for my children or helping his mother organize and pay her bills, his kindness is unparalleled." *Id.*

### C.      Billy's Dedication to Helping Others Extends to His Community

Billy's dedication and selflessness are evident not only in how Billy treats his family, but also in his friendship, faith, and desire to help those in need.  Indeed, the sheer duration of his many close friendships is a rarity and a testament to Billy's ability to maintain and foster friendships over the course of decades that saw marriages, deaths, births of children, changing jobs, buying and losing homes, and even through Billy's struggle with addiction.  Billy's compassion is something that others cannot help but notice.

> Throughout his life I have seen Billy on dozens of occasions take time to talk with people asking for help on the street . . .  Billy engages them at a human level, wishes them a better future and if possible, provides monetary assistance to these folks.  I can remember him doing this when we were teenagers walking through Faneuil Hall in Boston after a Red Sox game, and saw it a[s] recently as last November when we took a trip with several friends to Charlotte[,] North Carolina.  I've never asked him directly as to why he is so compassionate in these situations, but my sense is that his belief is bad fortune has put them in their current circumstance, and hopes that his kind words, reassurance and help can lift them up in the future.

Letter from Daniel Gallagher, Exhibit 9.

Derek Lessard has known Billy for eighteen years  since meeting through Derek's wife and Billy's friend of over forty years, Jacqueline .  The Lessards have twin boys, one of whom was diagnosed with autism at eighteen months old.  Mr. Lessard recalls the extent to which Billy supported their children.

> Caydan has a very limited communication ability and quite often will find a quiet place to sit by himself when introduced to a large group of people.  Billy always makes it a point to find Caydan, spend time with him and work through the communication gaps that exist in Caydan's world.  This is always so inspiring and proud to see.  While many others would continue to engage in normal conversation, play games, swim, etc., Billy consistently goes out of his way to ensure that Caydan is content and treats him as he would any normal kid.  Again, it's always special to

> find people like this who have the heart and compassion to ensure
> that all are accepted and treated with such love.

Letter from Derek Lessard, attached hereto as Exhibit 15.

The Sacco family and Gallagher family retained the deep bond that formed during the three months the Saccos lived with the Gallaghers in 2003.

> I have heard my children explain our relationship [with the
> Saccos] to others as 'we aren't related by blood but they're still
> family[.'] I can't recall a special event in our lives that they
> haven't been a part of. Even when we have 'family' parties for
> things like our children's birthdays, first communions,
> graduations, etc., the Sacco[s] are always included.

Letter from Katherine Gallagher, Exhibit 13.

Billy is also an active member of his church and an integral part of supporting the spiritual journeys of those around him. As previously mentioned, Jennifer Sacco converted to Catholicism after meeting Billy. "His unwavering support of Jenn as she sought to find God and received Confirmation later in life was a new beginning where they became regular parishioners of their church in Pelham, all before these events occurred." Letter from Ken Hannon, Exhibit 8. "Billy is also a man of faith. He attends church often and has blessed my husband and I by being the Godfather to our sons. It was important that his children were brought up with faith as well." Letter from Lindsey Sargent, Exhibit 4. When Taylor took it upon herself to apply to a Catholic high school, Billy "wanted nothing more than to provide that opportunity for [her]." Letter from Taylor Sacco, Exhibit 3.

### D. Billy Went Above and Beyond as a Mentor to Younger Colleagues

As a project manager at ████████ Billy actively fostered professional and personal relationships with his colleagues and was seen as a mentor by those whom he managed over the years. Even after becoming aware of Billy's transgressions, many of those who worked under Billy still laud his leadership and mentoring skills, seeing his offense conduct as an aberration.

George Elias was Billy's assistant for seven years and credits much of his professional

development to Billy's guidance.

> Unlike many other project managers who[] only think of
> themselves, he made it a goal to see all of his assistant project
> managers succeed . . . [Billy] wanted you to succeed and go on to
> become a project manager because he knew that it was not just
> about him, it was about all of us and as a company as a whole.
> There was never a point where I had doubts on whether or not he
> had my back. He showed it every[]day and when it came time for
> our yearly reviews, he made sure that the higher ups at our
> company knew exactly how great of a job we were doing. If he
> was not a selfless person, he could have easily taken all of the
> credit over the years which would have probably benefitted him
> with his salary, bonus, etc. however he made a point to give us the
> credit that was due because he wanted to see us all succeed.

Letter from George Elias, Exhibit 11.

Trevor Young began working for Billy shortly after joining ████████ in 2013

and the two immediately hit it off. Trevor writes:

> I am so grateful that throughout the years Billy taught me, let and
> encouraged me to grow beyond an assistant. I had worked for other
> people who either were not interested in taking the time to teach
> me or were careful not to allow me to grow beyond an assistant
> because they didn't want to personally lose the help. Billy never
> had that attitude. He always told me that if I didn't become my
> own project manager and couldn't be successful on my own it'd be
> a failure on both our part. He not only spoke it but showed it with
> his actions. He truly wanted the best for me.

Letter from Trevor Young, Exhibit 12.

Billy's mentorship and friendship with those who reported to him went well beyond a

typical boss-subordinate working relationship. Another of Billy's former assistant project

managers, Antonio "Tony" Bairos, writes that Billy was a "[g]reat support and mentor to all of

us, always taking the time for each of us." Letter from Antonio Bairos, Exhibit 16. Billy always

made an effort to be there for his team members and would be a source of support for them.

> We divided, and conquered, it was great, it felt great and as always, I had Bill's support and he had it from me. Billy has always been like an older brother to me. We joke and banter, we teach and learn, we fight and laugh, his family has always been kind to me, and Billy and Jen were even at my wedding.

*Id.*

> As the years went by my relationship with Billy grew beyond him just being my work superior and mentor. We became friends who discussed our lives, families, thoughts, beliefs, etc. He came to my wedding. He supported me as a friend when I was diagnosed with cancer. He gave me advice on what to expect and how to make sure I balanced my work and family when I had my first child. When I started running my own projects, he was genuinely happy for me and quickly and publicly treated me as a peer.

Letter from Trevor Young, Exhibit 12. The shock that reverberated among those who know Billy upon learning of his aberrant criminal acts underscores just how out of character they were in the face of an opioid addiction from the man with whom they lived, socialized, and worked day in and day out.

### E. Billy's Offense Was Directly Caused By His Struggle with Addiction

Billy's struggle with opioid addiction is a tragically familiar story that began with prescription pain medications following a medical procedure. Billy suffered a ruptured disc in 2004, requiring back surgery after which he was prescribed oxycodone and other opiates. PSR at ¶ 70. He quickly became physically dependent on narcotic pain medication and began supplementing the substantial quantities of prescription medication he received from his doctor with opioids purchased on the street. In 2009, Billy had a second spine surgery at Lawrence General Hospital in Lawrence, Massachusetts. His pain and addiction were so significant that he was unable to work between 2009 and 2010, and his spending on drugs resulted in the foreclosure of the Saccos' home in February 2010. *Id.* at ¶ 74. Losing his family's home brought into stark reality the impact his addiction had not only on himself but, most importantly, his

family. He enrolled in a brief inpatient addiction program at Hampstead Hospital in New Hampshire in 2010, followed by an intensive outpatient program. *Id.* His family was aware of his struggle with addiction and supported Billy as he sought help and treatment. With their support, and the support of his medical providers, Billy had a four-year period of sobriety between 2010 and 2014.

Unfortunately, complications from scar tissue from his first two surgeries required Billy to undergo a third spine surgery on July 24, 2014 at Lowell General Hospital. During this procedure, the surgeon inadvertently punctured Billy's spinal column causing a leak of spinal fluid. *See* Surgical Documentation, attached hereto as <u>Exhibit 17</u>. This complication required Billy to stay immobilized and in the hospital for ten days. The extremely painful recovery from this third surgery led to Billy again being prescribed opioid pain medication. Given his prior addiction, he quickly relapsed and reverted to supplementing his prescription medication with illegally-obtained opioid narcotics.

Billy's medical records paint a picture of the extent of his addiction during the period in which he committed the instant offense. PSR at ¶ 75 ("The time period between his involvement in the instant offense and his opioid addiction were verified by Mr. Sacco's medical records."). For example, on October 5, 2015, Billy had a urine test that was positive for buprenorphine (Suboxone), a medication commonly used to help treat opioid addiction. *See* Oct. 30, 2015 Medical Records, attached hereto as <u>Exhibit 18</u>. Billy told his doctor that he ran out of his prescription pain medication—OxyContin 20mg three times a day and oxycodone 15mg four times per day—and that his sister-in-law gave him a Suboxone pill because he was "withdrawing." *Id.* Billy informed his doctor that at one point he was taking up to 120 mg per day of oxycodone (10mg tablets of oxycodone ten to twelve times per day), and even then he

would run out of medication. *Id.* He was prescribed methadone by his primary care physician, but then failed a drug test due to oxycodone and methadone in his system. *Id.* His medical records stated Billy and his doctor "had a very frank discussion . . . and I know having discussed this case with Dr. Cody that he has discussed this with the patient as well." *Id.* His doctor continued, "We feel that he is quite opioid tolerant, but that some of the behaviors [he is exhibiting] is dysfunctional. While he continues to work and take care of his family, we are concerned that continued use of medication this way would result in long-term decrease in efficacy of the medication and, more importantly, other sequelae." *Id.*

Billy called his doctor in November 2015, reporting that he took ninety prescribed oxycodone pills in two weeks—going through the pills in less than half of the thirty days for which they were prescribed. PSR at ¶ 75; Nov. 13, 2015 Medical Records, attached hereto as Exhibit 19. Approximately one month later, Dr. Thomas Cody opined that Billy "has [a] tendency toward addictive personality" and encouraged Billy to discontinue short-acting opioids like oxycodone and instead try to manage his pain with a long-lasting fentanyl patch. Dec. 16, 2015 Medical Records, attached hereto as Exhibit 20.

Billy supplemented the narcotics he was prescribed with pills purchased on the street. Between 2014 and 2017—the same period in which he committed his offense—he spent between $3,000 and $5,000 per month on illegally purchased prescription oxycodone. PSR at ¶ 75. During the period of the instant offense, Billy spent up to 60 percent of his net income on his opioid addiction, draining his family's finances and leaving little money remaining to support his family. In the words of Billy's wife, Jennifer, "he was not the same person when he was using opiates." Letter from Jennifer Sacco, Exhibit 1. Billy's family knew of his substance abuse, but not the full extent. PSR at ¶ 75. At the height of his opioid dependency in 2017, Billy was using

100 mcg fentanyl patches, in addition to pills purchased on the street. *Id.* at ¶ 76. Ashamed and embarrassed that he relapsed, Billy tried to hide from his family the extent to which his addiction was affecting the family's finances by continuing to provide the same quality of life to which his family was accustomed. It was against this backdrop that Billy made the decision he would come to regret most in his life when he began illegally inflating change orders to offset financial gifts from ███████ who sent Billy money for the Sacco family's rent, his children's school tuition, family trips, and household expenses. *Id.* at ¶ 11.

**F.    Billy Terminated His Offense Conduct As Soon as He Achieved Sobriety**

Billy's brother-in-law died from a heroin overdose in 2016 at the young age of 36 years old. *Id.* at ¶ 76. This tragedy was a wake-up call for Billy, who realized that his addiction to opioid pills was no different. On June 19, 2017 (also just five days after his father's death) Billy visited his physician and asked to taper down the dose of his prescription opioid medication. June 19, 2017 Medical Records, attached hereto as <u>Exhibit 21</u>. At his next appointment with his doctor on October 18, 2017, Billy expressed a desire to taper off all opioids. Oct. 18, 2017 Medical Records, attached hereto as <u>Exhibit 22</u>. When he weaned himself off fentanyl, his wife "was beyond proud" of him, seeing "firsthand how difficult it was and the pain that he was in." Letter from Jennifer Sacco, <u>Exhibit 1</u>. Fortunately, Billy no longer feels the physical pain that was the impetus for his opioid dependence. Billy's longtime friend, Ken Hannan also witnessed Billy's journey from pain and addiction to sobriety.

> I was with Billy on the fateful day of his back injury and with him the entire way along this journey of pain and trouble. These past few years have seen a tremendous change in [Billy's] ability to live and thrive as his battle with prescription pills was left in the past. I feel that I have seen a return to his self and am saddened by these revelations that have come to light with regards to this matter. I truly believe that he is remorseful for all that has occurred over the past several years and has been on a long journey to recovery that has just started to allow him to live again and return to his true self.

Letter from Ken Hannan, Exhibit 8.

Billy voluntarily discontinued all opioid medications in November 2017 and has

remained sober for the last five years.  PSR at ¶ 76.

**G.    Billy Has Demonstrated Remorse and Accepts Responsibility for His Actions**

In addition to confronting his addiction, Billy has accepted full responsibility for his

offense.  In light of the letters from friends, family, and coworkers, it is no surprise that Billy was

more worried about how his actions affected his children than he was concerned for himself.  His

daughter, Taylor, wrote that after Billy's arrest, "his shame was evident.  He repeatedly

expressed his regrets and remorse to my family members, but his behavior with me was, and

continues to be, the greatest indication of the pain he feels.  He knows that we are so much alike,

and he knows how highly I regard him."  Letter from Taylor Sacco, Exhibit 3.  Billy was

remorseful not only for the offense itself, but for how his actions might negatively impact his

children, particularly because Tommy continued to work at █████████

> After his arrest when we sat down to talk about it he felt more
> sorry for me than I could have expected, it is hard working with
> people and hearing them talk day to day and I think he knew this.
> Him apologizing and really making it known that he did not want
> to ruin my life made me very sad and not quite sure how to
> approach the situation.  Over the past few months I have seen my
> father try to make things right and genuinely make it known that
> his actions affected more than just a few and he is sorry.

Letter from Thomas Sacco, Exhibit 2.  Jennifer Sacco agrees with her children, writing: "The

past few months have not been easy. I hear the regret in his voice, and I see the remorse on his

face. He is devastated. I know it breaks his heart seeing me stressed and his children upset. He

knows he has disappointed so many people."  Letter from Jennifer Sacco, Exhibit 1.

Taylor and Tommy both understand that their father broke the law and faces serious consequences for his actions. While neither child excuses Billy's mistakes, both believe that he was motivated by his desire to support his family.

> While I acknowledge that my father has made mistakes, I believe that all of his actions and decisions have been for the sake of his family. Truly, it is more than a belief, it is a deep understanding of who he is and what he values. To my father, his identity is built upon his role as 'the supporter'. Whether financially or emotionally, my dad has consistently gone above and beyond to make sure that my brother and I have had the tools to be successful.

Letter from Taylor Sacco, Exhibit 3.

> He plead guilty and is accepting responsibility for his actions, and I know that means he understands what he did was very wrong and is bettering himself day by day. He has been supporting our entire family by himself for decades and I know that everything he has ever done was for the family.

Letter from Thomas Sacco, Exhibit 2.

Billy has not shied away from expressing his remorse to his extended family, friends, and former colleagues whose letters attest to the genuineness of his remorse and his regret for how his actions have affected those around him.

> I know Billy has accepted responsibility for his actions and truly believe he regrets the decisions he has made. I also believe that he is fully aware of the resulting affect that these decisions can have on others around him; his friends, his family and most importantly his children.

Letter from Derek Lessard, Exhibit 15. Billy's sister-in-law, Lindsey, writes "Unfortunately, Billy has made a mistake and has deep regret and remorse for his wrongdoing." Letter from Lindsey Sargent, Exhibit 4. Billy's longtime friend John Erle has a similar impression of Billy's sincere remorse and remains optimistic that Billy will continue to seek redemption: "I know the

guilt and remorse Bill is feeling already, and if given a second chance, I believe he will do his best to redeem himself." Letter from John Erle, Exhibit 7.

Katherine Gallagher, with whom Billy and his family lived for three months nearly twenty years ago, writes:

> I personally know how much Billy regrets his actions. He has been extremely honest about this and has expressed nothing but remorse. I have witnessed [firsthand] how Billy is committed to improving his life so that he can be someone his family and friends are proud of.

Letter from Katherine Gallagher, Exhibit 13.

Katherine's husband, Daniel, has also seen this remorse from Billy.

> I know that Billy made a serious mistake in this case and showed tremendously bad judgment, but in addition to his guilty plea I know he has been very remorseful and is taking steps to improve his life going forwards.

Letter from Daniel Gallagher, Exhibit 9.

Ken Hannan was with Billy when he injured his back and saw how that injury triggered a chain of events including multiple major surgeries, opioid addiction, dire financial straits, foreclosure on the Sacco's family home, relapse, the instant offense conduct, and, now, recovery. Ken writes of his friend:

> Not once has Billy ever looked to someone else to blame for any of his actions, nor speak ill of anyone simply to put himself in a better light. He has completely and honestly admitted his faults and asked for understanding and mercy. I have faith in his ability to stay on the path he has been on for the past few years and continue to move forward as an example of rehabilitation, which I see him as now.

Letter from Ken Hannan, Exhibit 8.

Billy's willingness to accept the consequences of his actions came as no surprise to his former colleague, friend, and mentee, Trevor Young. "A long time ago, he taught me that when

you make a mistake the best thing to do is own it and work on fixing it.  It does not surprise me that Billy plead guilty if he knew he was wrong." Letter from Trevor Young, Exhibit 12.

Importantly, Billy has gone beyond expressions of remorse, turning his regret into action. Although Billy could not afford to pay restitution to ███████ given his financial circumstances, he demonstrated his remorse by taking the extraordinary step of borrowing money from his family in order to pay restitution in full prior to sentencing.  In doing so, Billy has demonstrated his remorse and his commitment to making the victim of his offense whole.

## II.    Nature and Circumstances of Offense Conduct

Mr. Sacco adopts the statement of the offense conduct in the PSR, and acknowledges that he is guilty of the offense charged.  Without intending to diminish his role in the fraud, Mr. Sacco provides the following facts to explain his role in and context for the offense.

Billy committed the offense out of desperation to support his family at a time when he was too ashamed to admit to his loved ones that he was taking the salary that should have been sufficient to support his family and spending it to support his addiction to prescription pain medication.  As previously discussed, Billy was almost completely responsible for financially supporting his family and during the time of the offense conduct, he was spending up to $5,000 per month on illegally purchased prescription narcotics.  PSR at ¶ 120.  Between 2014 and 2017, Billy accepted financial gifts from ██ ████ and repaid a small percentage of these gifts by falsely inflating change orders ███████ submitted on behalf of his company, ███████████ ████████████ ("████ *Id.* at ¶ 10.  Billy's employer, ██████████ then unknowingly paid ████ on the inflated change orders.  *Id.*  Billy used the money from ███████ for expenses such as rent for the Sacco family home, Billy's children's school tuition, family trips, and household purchases. *Id.* at ¶ 11.  Although ███████ purportedly gave Billy over $200,000, most of the money was intended to be a gift and not repaid.  *Id.*  Aside from the funds

identified in the inflated change orders for which Billy has paid full restitution, he is thankful that his offense has had no known additional monetary effect on ▓▓▓▓▓▓ or its clients.

Moreover, although Mr. Sacco's offense conduct was discovered based on information from ▓▓▓▓▓ the allegations against Mr. Sacco are otherwise unrelated to the bid-rigging conduct alleged in the "related cases" identified in the PSR as part of a broader, ongoing antitrust investigation resulting in guilty pleas of four individuals (including ▓▓▓▓▓ and one corporation. *Id.* at ¶ 7. Mr. Sacco is not alleged to have been involved in the alleged bid-rigging scheme as he did not have a significant, if any, role in awarding bids.[1] *See id.* at ¶ 13.

## ARGUMENT

### I.  Legal Standard

Consistent with *Booker* and its progeny, and 18 U.S.C. § 3553(a), the Court should deviate from the guidelines and impose a sentence of two years probation in this case. *See United States v. Booker*, 543 U.S. 200, 245 (2005). As the Court is well-aware, the guidelines are just one factor among several that sentencing courts are required to consider in imposing a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a). *Id.* In so doing, the Court "may not presume that the Guidelines range is reasonable." *United States v. Gall*, 552 U.S. 38, 49-50 (2007).

"[D]istrict courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008). The Court may, for instance, "vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)

---

[1] Billy acknowledges providing ▓▓▓▓ with information about particular jobs that could have resulted in savings and fewer headaches for ▓▓▓▓ company on those jobs. *See* PSR at ¶¶ 7-13. However, defense counsel submits that this information is not alleged to have provided ▓▓▓▓ or his company with any advantage over their competitors.

(internal modifications omitted). "[S]entencing necessitates a case-by-case approach, the hallmark of which is flexibility. Accordingly, a sentencing court should not consider itself constrained by the guidelines to the extent there are sound, case-specific reasons for deviating from them." *United States v. Prosperi*, 686 F.3d 32, 42 (1st Cir. 2012) (internal citations and quotations omitted). Nonetheless, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," yet the Guidelines are merely the "starting point and the initial benchmark[,] . . . not the only consideration." *Gall*, 552 U.S. at 49.

The sentencing factors that *Booker* and Section 3553(a) require district courts to consider include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant [§ 3553(a)(1)];

(2) the need for the sentence imposed-

    (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (b) to afford adequate deterrence to criminal conduct;

    (c) to protect the public from further crimes of the defendant; and

    (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [§ 3553(a)(2)]

(2) the kinds of sentences available [§ 3553(a)(3)];

(3) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range [§ 3553(a)(4) & (a)(5)];

(4) the need to avoid unwarranted sentencing disparity among defendants with similar records that have been found guilty of similar conduct [§ 3553(a)(6)]; and

(5) the need to provide restitution to any victims of the offense(s) [§ 3553(a)(7)]

*Booker*, 543 U.S. at 261.

Furthermore, the "parsimony" clause in Section 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in [section 3553(a)(2)]."  18 U.S.C. § 3553(a); *see also United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("Plainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher.").

## II.  The Advisory Guidelines Sentencing Range

Pursuant to the plea agreement, the parties agreed that Billy's total adjusted offense level under the Sentencing Guidelines is calculated as follows:

| CATEGORY | POINTS |
|---|---|
| Base Offense Level - U.S.S.G. § 2X1.1(a)(1) | 7 |
| Loss Amount between $40,000 and $95,000 - U.S.S.G. § 2B1.1(b)(1)(D) | +6 |
| Acceptance of Responsibility - U.S.S.G. § 3E1.1(a) | -2 |
| **Total Adjusted Offense Level** | **11** |

(Plea Agreement at 4).  Billy's prior criminal history results in a criminal history score of one, making his criminal history level for purposes of the Sentencing Guidelines a Category I (PSR at ¶ 57).  The advisory Guidelines Sentencing Range associated with an adjusted offense level of 11 for an individual with a criminal history of Category I is eight to fourteen months imprisonment. *See* PSR at ¶ 92.  However, Billy is also eligible for not less than one nor more than five years' probation because the offense is a Class C Felony.  *Id.* at ¶ 96.  Since the applicable guideline range is in Zone B of the Sentencing Table, the Court may impose a Guidelines sentence of probation with a condition or combination of conditions requiring, among other things, community confinement or home detention.  U.S.S.G. § 5B1.1(a)(2); PSR at ¶ 98.

**III.     The Sentencing Guidelines Do Not Properly Reflect the Degree of Billy's Culpability**

The Sentencing Guidelines as applied to economic offenses have increasingly come under fire as doing a poor job of reflecting the culpability of defendants generally, and they are not an accurate reflection of Billy's culpability in particular.  Although the Sentencing Guidelines use "loss" as a measure of a defendant's culpability, *see* U.S.S.G. § 2B1.1 background, loss is, at best, an imperfect reflection of culpability.  *See United States v. Musgrave*, 647 F. App'x 529, 538-39 (6th Cir. 2016) ("[T]he data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases") (quoting Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 19 (2013)).  Second Circuit courts have criticized the Sentencing Guidelines' emphasis on loss amount "without . . . explaining why it is appropriate to accord such huge weight to such factors."  *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.").  "In many cases . . . the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."  *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004).

By largely focusing on a single factor in all theft cases, "the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."  *Gupta*, 904 F. Supp. 2d at 351 (internal citation omitted).  The loss amount is not solely attributable to the defendant's state of mind, and in many cases is the function of a certain

degree of chance. *See Emmenegger*, 329 F. Supp. 2d at 427. A defendant caught a short time into a fraud will usually have caused a lower amount of loss than a defendant caught years later, even though they might be equally responsible for the losses. One defendant is not more or less culpable or deserving of punishment simply on the basis of when the theft was discovered, particularly in a case such as Billy's where he voluntarily ceased the offense conduct prior to it being discovered.[2]

The loss table has also been criticized for the lack of underlying empirical data, and sentencing courts have the discretion to vary from the resulting guidelines sentencing range. *See Kimbrough*, 552 U.S. at 109-10; *see also Musgrave*, 647 F. App'x at 538 ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances."). Although the Sentencing Guidelines were intended to reduce unwarranted disparities, the guidelines calculations "are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data." *Gupta*, 904 F. Supp. 2d at 351.

---

[2] Even if loss were a reasonable proxy for culpability, which it is not, the loss table does not accomplish the Sentencing Guidelines' goal of minimizing sentencing disparities. The loss table lumps together defendants with widely differing loss figures. *See Corsey*, 723 F.3d at 380 ("For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges.") (Underhill, J., concurring) (quoting Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 168 (2008)). Billy's loss amount, $41,195.85, is at the low end of the applicable band, which includes frauds ranging from over $40,000 to frauds of $95,000. *See* U.S.S.G. § 2B1.1(b)(1)(E). "But in the arbitrary world of the Guidelines, this big difference makes little difference." *Gupta*, 904 F. Supp. 2d at 353. Thus, a defendant who caused more than *double* Billy's loss would have the same guideline range.

**IV.     The Court Should Sentence Billy to Probation to Effectuate the Purposes of 18 U.S.C. § 3553(e)**

Application of the factors set forth in 18 U.S.C. § 3553(a) to the facts and circumstances of this case makes clear that the sentence outside the guideline range agreed upon by the parties is justified. "Once the [guideline sentence range] is properly calculated, sentencing becomes a judgment call for the court, and the court may construct a sentence varying from the [guideline sentence range] based on a complex of factors whose interplay and precise weight cannot even be precisely described." *Prosperi*, 686 F.3d at 42 (internal citation omitted).

**A.     Incarceration Is Not Required to Reflect the Seriousness of the Offense, to Promote Respect for the Law, or to Provide Just Punishment for the Offense**

A sentence of two years probation and restitution in the amount of $41,195.85—which Billy has already paid—is substantial punishment, and is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense.

As noted above, Billy's crime was caused by, and coexistent with, his addition to opioid pain medication. His criminal conduct ceased as soon as he confronted his dependency and worked with his prescribing physician to wean off opioids in 2017. As the Probation Department described in the PSR, Billy "was spending approximately $5,000 a month on illegally purchased prescription opioids and did not have the financial means to support his family. Thus, he participated in the conduct of the instant offense of conviction to financially support his family because his addiction robbed his family of their basic wants and needs." PSR at ¶ 120. Critically, the Probation Department noted, "Moving forward, Billy will need to focus on securing legitimate employment to support himself and his wife, while working to make his victims full. Also, he is to continue to focus on maintaining his sobriety." *Id.*

Sentencing Billy to prison would be at odds with these objectives. Billy is already experiencing severe consequences for his crime. He lost a well-paying job that, by all accounts, he was particularly well-suited to perform.[3] Given the publicity surrounding this case, it is doubtful that Billy will be able to find a similar job in his chosen field.[4] Whereas he was previously a respected member of his community with a reputation as a successful construction manager, his reputation has been seriously tarnished, and he now faces the stigma of a felony conviction. Billy's community is now fully aware of his actions, and he will never be free of the consequences of his crime. The proposed sentence is sufficient to reflect the seriousness of the offense and to provide Billy with just punishment. *See Prosperi*, 686 F.3d at 48 ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account . . . for the wrong that they committed.").

Importantly, the Sentencing Guidelines recognize that "[t]here may be cases in which a departure from the sentencing options authorized . . . for Zone B is appropriate to accomplish a specific treatment purpose." Cases that are appropriate for such departures are those in which "the court finds that (A) the defendant is an abuser of narcotics, other controlled substances, or alcohol . . . and (B) defendant's criminality is related to the treatment problem to be addressed." U.S.S.G. § 5C1.1 cmt. n. 6. "In determining whether such a departure is appropriate, the court should consider, among other things, (1) the likelihood that completion of the treatment program

---

[3] *See, e.g.*, Letter from George Elias, Exhibit 11, ("Bill was the golden child at our company and that was something that was earned. He had an energy that could be seen from miles away and the drive to do whatever he set his mind to."); Letter from Antonio Bairos, Exhibit 16 ("One of the best attributes Bill possesses is his accountability, and his dedication. Dedication to the project, to his colleagues, his friends, and most of all, he always took responsibility for his actions."); Letter from Trevor Young, Exhibit 12 ("Billy knew just about everything and everyone in our industry. He knew how to get things done and get them done effectively and efficiently. He managed more projects at higher dollar values than anyone in the company.").

[4] *See, e.g.*, Tara O'Neill, Feds: Milford man accused of construction project fraud scheme, CONNECTICUT POST, Dec. 8, 2021 available at https://www.ctpost.com/news/article/Feds-Milford-man-accused-of-construction-project-16684277.php; Tara O'Neill, Feds: Man pleads guilty in construction project scheme, CT INSIDER, Feb. 15, 2022, available at https://www.ctinsider.com/news/article/Feds-Man-pleads-guilty-in-construction-project-16920467.php.

will successfully address the treatment problem, thereby reducing the risk to the public from further crimes of the defendant, and (2) whether imposition [of a departure] will increase the risk to the public from further crimes of the defendant." *Id.*

This case is exactly the type the U.S. Sentencing Commission envisioned as being a good candidate for a downward departure. Billy's criminal conduct was coterminous with his drug use: as soon as he was able to achieve sobriety, his criminal behavior immediately ceased. With the substantial assistance of his family, friends, and medical providers, Billy has been in recovery for nearly five years. Sentencing Billy to prison would remove him from the support network that has helped keep him sober, delay his ability to obtain gainful employment (which the Probation Department has recommended (PSR at ¶ 120)), and would surround Billy with antisocial influences.[5]

### B. Billy's Character and Background Militate Against Incarceration

Despite his shortcomings, the letters from Billy's friends and family describe a man of good character who cares deeply about others and about his community. Consistent with this character, Billy has demonstrated sincere remorse for his wrongdoing by promptly pleading guilty to an Information after his arrest and borrowing money to fully pay restitution to the victim of his crime prior to sentencing. A period of incarceration is not necessary to teach him the error of his ways, as he is already deeply ashamed of his conduct and by the resulting loss of his reputation.

---

[5] *See* U.S. Sent'g Comm'n, Staff Discussion Paper, <u>Sentencing Options Under the Guidelines</u>, at 19 (1996) ("alternatives [to incarceration] divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties") (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/working-group-reports/simplification/SENTOPT.pdf); *see also United States v. Leitch*, No. 2013 WL 753445, Nos. 11–CR–00609 (JG), 11–CR–00457 (JG), 11–CR–00039 (JG), at *12 (E.D.N.Y. Feb. 28, 2013) (approving of funding for "treatment alternatives to incarceration for offenders who may benefit from treatment for substance abuse and mental illness").

Incarceration is not necessary to ensure that Billy will never again engage in unlawful conduct, as his offense conduct was entirely caused by financial distress resulting from a drug addiction.  Billy's offense conduct lasted from June 2014 through December 2017.  PSR at ¶ 10.  This was precisely the period of time in which he experienced a relapse of addiction to opioid pain medication after his third spine surgery in July 2014 until he tapered off pain medication in November 2017.  *Id.* at ¶ 119.  Billy lived an otherwise exemplary law-abiding life both before his relapse in 2014 and after he achieved sobriety in 2017.[6]  During his relapse between 2014 and 2017, Billy was spending approximately $5,000 per month—up to 60 percent of his net income—to supplement the opioid pain medication his doctors prescribed with pills he purchased on the street.  *Id.* at ¶ 120.  His addiction left him with little money to support his family.  Having previously lost his home to foreclosure during this first period of addiction in 2009, Billy was ashamed and embarrassed by his relapse, and tried to hide from his family the extent to which his addiction was again affecting the family's finances.  Billy's lack of candor with his family was a symptom of his addiction.  Instead of admitting that he spent the majority of his income to support his addiction to pills, he tried to maintain appearances by continuing to support his family by paying rent for his family's home, his daughter's college tuition, and other family expenses.  It was in this context that Billy requested money from ███ ████

It is telling that Billy's criminal conduct ceased immediately upon him becoming sober in 2017.  Billy recognizes that his addiction is a lifelong struggle that requires continued treatment.  However, the fact that he voluntarily tapered himself off opioid pain medications and has maintained sobriety for nearly five years is a testament to his high likelihood of success in the

---

[6] The one exception is a guilty plea to operating under the influence of liquor in November 2009.  PSR at ¶ 55.

future. Billy does not need to be incarcerated in order to achieve specific deterrence—his actions indicate that he learned his lesson by the end of 2017.

Billy acknowledges that he violated the law for a lengthy period of time. Although Billy achieved sobriety in 2017 and voluntarily ceased the offense conduct before it was discovered, this case, and the complete collapse of his scheme, brought into sharp focus the serious consequences Billy must accept for his behavior. Billy hit rock bottom in 2017, and he has sought to take responsibility for his conduct since then. He is deeply sorry for his actions, and for the pain he has caused his victims and family. He promptly agreed to plead guilty to an Information, sparing the government the need to indict or try this case.

Billy's conviction renders it a virtual certainty that he will never work in the construction industry again. Billy was terminated from his position due to his offense conduct (PSR at ¶ 80), and it is unlikely that another construction contractor will hire him given the publicity of this case. For that reason alone, the criminal law has already achieved specific deterrence.[7]

Moreover, in light of the financial, reputational, professional, and emotional devastation Billy has already endured, he has zero incentive to engage in any future misconduct.[8] The Court

---

[7] *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) ("Elimination of the defendant's ability to engage in similar or related activities[,] or indeed any major business activity . . . constitutes a source of both individual and general deterrence."); *United States v. Milken*, No. SS 89 CR 41 (KMW), 1992 WL 196797, at *7 (S.D.N.Y. Aug. 5, 1992) (the defendant "was adequately deterred from further wrongdoing by being barred for life from the securities industry" and "by loss of his position in the financial community"); *Emmenegger*, 329 F. Supp. at 428 ("[The defendant] yielded to a temptation and committed a crime particularly adapted to his chosen career. That career is over, and his potential to commit this particular type of crime has been eliminated."); *United States v. Stewart*, 590 F.3d 93, 141 (2d. Cir. 2009) (the defendant's conviction "made it doubtful that the defendant could pursue his career as an academic or translator, and therefore . . . the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment" (citation omitted)); *United States v. Roth*, No. 05 CR 792-5, 2008 WL 686783, at *3 (N.D. Ill. Mar. 11, 2008) ("Roth has lost her law license as a result of this case. Therefore, a sentence of imprisonment to deter Roth and protect the public from further criminal conduct by her is unnecessary.").

[8] *See, e.g.*, *Gaind*, 829 F. Supp. at 671 (the defendant's "substantial loss of assets and income" served as a specific deterrent); *Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct."); *Gupta*, 904 F.Supp.2d at 355 ("[I]t seems obvious that, having suffered such a blow to his reputation, [the defendant] is unlikely to repeat his transgression[.]").

can also be well-assured that Billy poses no threat of recidivism given the vast network of family and friends eager to help guide him forward in a positive direction.[9]  Billy is grateful for the outpouring of support he has received, and he has no intention of letting anyone down.

Finally, but not surprisingly given his character, Billy has been living under the conditions of his pre-trial release without a single transgression, providing even further proof that a custodial sentence is unnecessary to prevent recidivism.  Notably, he has not had any issues with substance abuse since his arrest in November 2021.[10]

A custodial sentence is therefore wholly unnecessary to deter Billy from reoffending.

### D.  A Sentence of Incarceration Will Not Further General Deterrence

Nor is a period of incarceration necessary to deter other wrongdoers.  Studies have consistently shown that in white collar cases the certainty of punishment has a greater deterrent effect than the length of sentences.  *See* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-49 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity. . . . [T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just.

---

[9] *See, e.g.*, Desmond, 2008 WL 686779, at *3 ("The numerous letters received on behalf of Desmond show him to be an exceptionally caring and kind individual. The Court is confident that Desmond's error in judgment, which has already cost him dearly in terms of his career, finances and reputation, is a one-time occurrence."); *United States v. Yanza-Pailzaca*, No. 09-CR-708-01, 2010 WL 307954, at *2 (E.D.N.Y. Jan. 22, 2010) ("It is unlikely that [the defendant] will engage in further criminal activity in light of his moral nature, strong ties to family, and reputation for honesty.").

[10] *See, e.g.*, *United States v. Chao Vang*, 789 F. Supp. 2d 1020, 1023 (E.D. Wis. 2011) ("Given defendant's . . . compliance with the conditions of pre-trial release, solid history of employment, and strong family support, I also saw no need for prison to protect the public and deter."); *United States v. Redfern*, No. 1:11-CR-64, 2015 WL 540251, at *3 (N.D. Ind. Feb. 10, 2015) ("Defendant poses little risk to the public if she were to be sentenced to probation rather than a term of imprisonment. Indeed, for the past three-and-a-half years the Defendant has substantially complied with the conditions of her pretrial release.").

1, 28 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

### E.    Comparable Cases Support a Sentence of Probation

An important objective of federal sentencing is to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). According to the most recent statistics published by the U.S. Sentencing Commission, 64.9 percent of defendants convicted of fraud offenses in the Second Circuit who were eligible for non-prison sentences were given non-prison sentences. *See* United States Sentencing Commission, "Statistical Information Packet, Fiscal Year 2021, Second Circuit," *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/2c21.pdf, at 10. Nationally, while only 42.8 of fraud defendants received sentences within the guideline sentencing range, just 27.3 percent of such defendants did in the Second Circuit. *Id.* at 18. Defendants in Connecticut generally receive much more lenient sentences than those in other districts, as only 25.9 percent of all defendants sentenced in this district receive sentences within the guidelines sentencing range. *Id.* at 13.

Recent wire fraud cases from the District of Connecticut emphasize the potential for significant sentencing disparities if the Court adopts a guidelines sentence. In *United States v. Finkle*, 3:21-cr-00024 (SRU), Judge Underhill sentenced the defendant to three years probation for an eight-year fraud in which the program director for the East Haven Board of Education School Age Child Care Program pilfered tuition payments made for students in the program and used them for her own benefit. In total, the defendant stole nearly $39,000 in payments meant for students' tuition and deposited these payments into her own bank account. After receiving an enhancement for abusing a position of trust, the defendant's guideline sentencing range was 8 to

14 months, and the government recommended a sentence within this range. On May 6, 2021, Judge Underhill imposed a sentence of three years probation, 50 hours of community service, a fine of $20,000, and restitution in the amount of $38,554.50—an amount similar to the loss caused by Billy's conduct.

In *United States v. Gramins*, 3:15-cr-00155 (RNC), Judge Chatigny sentenced the defendant to two years probation, with six months of home confinement, for a securities fraud that the government described as lying to customers to induce them to buy residential mortgage backed securities bonds at higher prices or sell such bonds at lower prices than they would have otherwise. The government's alleged loss in that case was between $9.5 million and $25 million (*id.* at ECF No. 593), whereas the defendant argued that his actions did not result in any loss (*id.* at ECF No. 585). The Probation Department calculated his guidelines sentence range to be 168 to 210 months imprisonment, reduced to the statutory maximum of 60 months. The government recommended "a substantial term of imprisonment" below the statutory maximum based, in part, on the "impact that this conviction has had and will have on [the defendant's] employment prospects" and the "impact his imprisonment will have on his wife and children." Gov't Sentencing Memo (ECF No. 593), at 74. These arguments apply with equal force to Billy's situation. Ultimately, the Court agreed with the defense and sentenced that defendant to two years probation, six months to be served in home confinement, and 300 hours community service.

In *United States v. Thomas Recck*, 3:15-cr-00015 (JAM), Judge Meyer sentenced the defendant to five years probation for stealing more than $125,000 from the Secretary of Connecticut Canine Search and Rescue to fund losses caused by a gambling addiction. Like Billy, the defendant voluntarily ceased the offense conduct, demonstrated substantial post-

offense rehabilitative behavior to address his addiction, and paid restitution to the victim prior to sentencing. The Court agreed that the defendant's offense was a byproduct of addiction, and sentenced the defendant to five years probation.

These are just three examples of numerous similar cases in this district in which defendants received nonincarcerative sentences and sentences significantly below their applicable guideline sentencing range for conduct and loss amounts similar to or higher than Billy's. All of these cases involve defendants who did not cooperate with the government. The following chart illustrates these and additional cases, in descending order of loss amount:

| Case | Loss Amount | Sentence Imposed | Guideline Range |
| --- | --- | --- | --- |
| *U.S. v. Janzayb Khan* 3:17-cr-00274 (JAM) | $165,954.00 | 5 years probation | 12-21 months |
| *U.S. v. Thomas Recck* 3:15-cr-00015 (JAM) | $125,649.77 | 5 years probation | 21-27 months |
| U.S. v. Zimer Kalici 3:19-cr-00235 (JAM) | $52,417.84 | 2 years probation and 250 hours community service | 6-12 months |
| *U.S. v. Catherine Finkle* 3:21-cr-00024 (SRU) | $ 38,554.50 | 3 years probation with six months home confinement | 8-14 months |
| *U.S. v. Thomas Popillo* 3:19-cr-00197 (VAB) | $ 37,568.68 | 2 years probation with six months home confinement | 6-12 months |
| *U.S. v. Steven F. Harvin* 3:18-cr-00322 (MPS) | $ 32,854.00 | 3 years probation with 60 days home confinement | 6-12 months |

These comparable cases support Billy's position that a sentence of two years probation is sufficient but not greater than necessary to avoid unwarranted sentencing disparities.

F.     **No Criminal Fine Is Necessary Based On Billy's Financial Condition and the Payment of Restitution Prior to Sentencing**

Although the advisory Sentencing Guidelines provide for the possible imposition of a fine, no fine is warranted here, particularly where Billy does not have the ability to pay a fine, and where he has already paid restitution to the victim in full. Billy's financial disclosure, completed before he made restitution payments, indicates that he could not afford to pay restitution. Billy could have agreed to pay a minimal amount each month towards restitution, as

many defendants in his financial situation do.  Instead, Billy took the extraordinary step of borrowing money from family members to ensure that the victim of his crime was made whole prior to sentencing.

Based on his financial disclosure to the Probation Department, Billy has no ability to pay a fine, and the Court should decline to impose one.

## CONCLUSION

Mr. Sacco respectfully requests the Court to impose a sentence of probation, or, in the alternative, any combination of punishments other than a custodial sentence, restitution of $41,195.47 (which has already been paid), and no criminal fine. Such a sentence would adequately serve all the purposes of sentencing, including general and specific deterrence. Indeed, there is certainly no reason to believe that there is any risk that Mr. Sacco would reoffend.  Mr. Sacco's continued treatment for his addiction in a non-incarcerative setting would be most beneficial for Mr. Sacco and for society at large.

Dated: June 23, 2022

WILLIAM A. SACCO,

By his attorneys,

*/s/ Seth B. Orkand*
Seth B. Orkand (*pro hac vice* motion granted)
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, MA  02108
(617) 557-5900
sorkand@rc.com

Edward Heath (CT20992)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597
860-275-8200
eheath@rc.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 23, 2022, a copy of the foregoing DEFENDANT'S MEMORANDUM IN AID OF SENTENCING was filed by ECF. Notice of this filing will be sent by email to all parties or by mail to anyone unable to accept electronic filing.

_/s/ Seth B. Orkand_____
Seth B. Orkand
