UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:22CR27 (KAD) |
| | : | |
| v. | : | |
| | : | |
| WILLIAM A. SACCO | : | July 1, 2022 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States submits this memorandum to aid the Court in the upcoming sentencing of the defendant, William A. Sacco (the "defendant" or "Sacco"), scheduled for July 8, 2022 at 2 p.m. On February 14, 2022, Sacco waived his right to indictment and pled guilty to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.

For over three years, Sacco defrauded his former employer, a mechanical contractor firm based in Massachusetts, of over $41,195.85 for his personal gain. As a longtime project manager, Sacco manipulated the change order process at his employer to inflate the true cost of subcontracting jobs in order to enrich himself. In so doing, Sacco exploited a personal and professional relationship he had with his co-conspirator, Individual B, who was an owner of an insulation company (Company B) that performed subcontract work for Sacco's former employer. Sacco used that stolen money to pay for a child's college tuition and expenses, a graduation party, airfare and hotel for out-of-state trips, rent, and other personal expenses.

Crimes like the one Sacco committed here are difficult to detect, investigate, and prosecute. Accordingly, it is important that any sentence sufficiently deter other wrongdoers and those tempted to engage in such employer-based fraud, particularly those in the construction

1

industry where fraud can be rampant. Given the seriousness of Sacco's conduct and the importance of the need for general deterrence in this case, a sentence within the undisputed Guidelines range of 8 to 14 months is necessary to satisfy the mandate of 18 U.S.C. § 3553(a). Such a sentence would also promote respect for the law and provide just but fair punishment. Conversely, Sacco's request for a probationary sentence should be rejected. Such a lenient sentence undermine, not advance, the sentencing goals of 18 U.S.C. § 3553(a) and send the wrong message to the public that this Court will not hold white collar defendants like Sacco accountable.

## I. The Offense Conduct

The PSR accurately summarizes Sacco's years-long criminal conduct. *See* PSR ¶¶ 6-37. Sacco does not dispute the offense conduct set forth in the PSR. Def. Memo. at 19. In light of the uncontested facts of this case as well as the detailed stipulation of offense conduct in the parties' plea agreement, the government will not recount them here. For the purposes of its sentencing memorandum, therefore, the government will focus on some particular aspects of Sacco's conduct and background.

### A. Sacco's Payouts from Individual B and Company B Started Before the Conspiracy and Continued After the Conspiracy.

As an initial matter, it is important that Sacco's crime be viewed in the proper context. Contrary to the tenor of Sacco's arguments, there is no evidence that his crime emerged from an addiction relapse. Rather, well before June 2014, when the charged crime began, Sacco was already asking for and receiving side payments from Individual B and Company B. That relationship continued years after Sacco's stated recovery in late 2017, the end of the charged conspiracy. Thus, while Sacco implores the Court to view his crime solely through the lens of

2

substance abuse, Sacco's crime was fueled equally—if not more—by simple greed.

The crime that Sacco pled guilty to—conspiracy to commit wire fraud—encompasses the government's specific evidence of Sacco and his co-conspirator manipulating change orders on certain jobs that Sacco submitted to his former employer. *See* Plea Agmt. Ex. A; PSR ¶ 37. The fraud arose from Sacco's materially false representations to his employer that additional costs on two projects were legitimate, when in fact he knew they were not. *See* PSR ¶¶ 19, 28-29. The fraud resulted in over $41,000 in actual losses to the employer. *See* Plea Agmt. Ex. A; PSR ¶¶ 37, 103.

As Sacco has acknowledged, however, he obtained over $200,000 in payments from his co-conspirator, Individual B. Plea Agmt. at 10 ¶ 4; PSR ¶ 11. The scheme served as a means for Sacco and Individual B to partially offset the cost of those payments. PSR ¶ 11. Voluntary, under the table payments from a business owner to a customer—in and of themselves—are not necessarily a federal crime. That does not mean, however, that those payments are ethical or otherwise compliant with company standards and policies. The issue here is that, in his sentencing memo, Sacco recounts a narrative that neatly marries his charged offense with his opioid addiction from July 2014 through November 2017 and states that the latter "directly caused" the former. Def. Memo. at 12; Doc. No. 51-3 (Def. Letter to USPO dated June 10, 2022) at 3 ("It was in this context [i.e., the relapse] that Mr. Sacco *began relying* on gifts from [Individual B] to supplement his income so he could keep up appearances to his family and ensure that bills were paid." (emphasis added)). In other words, Sacco suggests that the recurrence of his opioid abuse caused him to seek payments from Individual B. The truth, however, is more complicated.

In fact, Sacco had a long history of asking for handouts from Individual B and Company B from 2013 through early 2021.   While the government has no specific evidence of additional, padded change orders actually being submitted to Sacco's former employer before June 2014 or after November 2017, it does not change the fact that Sacco was asking for and got payments from Individual B before and after his opioid relapse from 2014 to 2017.

For example, Sacco asserts that he had a "four-year period of sobriety between 2010 and 2014."   Def. Memo. at 13.   Yet the government's investigation revealed that, on March 7, 2013, Sacco emailed Individual B and another owner of Company B the following request:   "I am desperate for a huge favor they have started eviction process from my house I owe 5,250 in payments to landlord is there a way you could send him a check and I can work it out with you guys?   Please let me know I am in a panic[.]"   Sealed Ex. 1.   In another example, on September 3, 2013, Sacco emailed Individual B, with a subject line "cc," with the message:   "so what i need to do is pay 3K to central catholic, if you give me the cc # and your address i can make a payment through their website[.]"   Sealed Ex. 2.   And on January 25, 2014—six months before the surgery Sacco identifies as the cause of his relapse, *see* Def. Memo. at 13—he had Individual B pay for a Sweet 16 celebration for his daughter at Ristorante Fiore in Boston for 13 guests.   Sealed Ex. 3.

Similarly, Sacco states that he stopped using opioids in November 2017 "and has remained sober for the last five years."   Def. Memo. at 16; PSR ¶ 76.   Nevertheless, the investigation revealed that Individual B and Company B continued to pay Sacco's rent for at least another three years, through at least December 3, 2020.   *See* Sealed Ex. 4.   Indeed, notwithstanding the increase in Sacco's income at his former employer, *see* PSR ¶ 80, Sacco still

received rental payments from Individual B and Company B for over three years totaling

$42,000 *after* Sacco stopped using opioids. *Id.*[1] The amount of rent Sacco got Individual B

and Company B to pay was well over 10 percent of Sacco's gross salary, which is a significant

expense he did not have to bear himself. *Compare* Sealed Ex. 4 *with* PSR ¶ 80.

Thus, there is a disconnect between the charged crime—conspiring to submit padded

change orders to Sacco's former employer—and Sacco's assertion that his substance abuse

"directly caused" it. Def. Memo. at 12. Sacco's motivation to enrich himself—or

"maintain[ing] appearances," as he acknowledges, *see* Def. Memo. 28—has been a constant in

his life far longer than his substance abuse. While there is a *correlation* in the timing between

his most recent period of opioid addiction and the charged change order scheme, there is no

evidence that the former "directly caused" the latter. In this context, Sacco's overall conduct

appears to be driven by as much, if not more than, garden variety greed and a sense of

entitlement rather than addiction-fueled desperation.

### B. Sacco Was Not Forthright with the Court About His Substance Abuse History, Which Has Now Become a Prominent Mitigation Argument.

Throughout his sentencing memo, Sacco focuses significantly on his history of substance

abuse with opioids. Def. Memo. at 12-16, 25, 28-29. While the government does not question

the legitimacy of Sacco's abuse or his commendable efforts at recovery, he has also

acknowledged that he did not disclose the true extent of history until *after* the draft PSR was

issued. *See* PSR Add. at 2; Def. Letter to USPO dated June 10, 2022 (attached as Doc. No. 51-

---

[1] The government notes that Sacco—to his credit—borrowed from his family to pay the entire amount of the agreed-upon restitution before sentencing, yet relied on Individual B and Company B to pay his rent for three years for nearly that same amount.

3) (noting that USPO "learned additional information that Mr. Sacco did not share with you during his initial interview"). During the initial PSR interview, Sacco disclosed an opioid addiction but not its severity, nor that—as he later disclosed—that he bought opioids off the street totaling $3,000 to $5,000 a month. *Compare* Draft PSR ¶ 73 *with* PSR ¶ 75. And while Sacco initially told the USPO that he had never participated in any substance abuse treatment programs, *see* Draft PSR ¶ 7, he now states that he was, in fact, enrolled in an inpatient addiction program in 2010, followed by an intensive outpatient program. *See* PSR ¶ 74. Thus, what was initially disclosed incompletely to the Court has now turned into a "causative factor[] of his offense." Def. Letter to USPO dated June 10, 2022 at 1. Not only does this belated disclosure raises questions about Sacco's candor to the U.S. Probation Office and the Court, but it also raises concerns about whether Sacco has truly accepted responsibility for his conduct, particularly in light of the incomplete chronology discussed in Section I.A above. If Sacco has had difficulty acknowledging what he did and what led to his actions, his risk of recidivism is likely to be higher.

### C. Sacco Used the Payouts to Pay for Discretionary Expenses.

Sacco's financial motivation for engaging in the admitted conspiracy is not fully explained by his expenditures on illegal opioids. While certainly some of the $200,000 that Sacco obtained from Individual B went to pay for his rent, some of it reportedly went to pay for *discretionary* expenses, like an iPad for his son (*see* PSR ¶ 15), Christmas shopping (*see* PSR ¶ 20), private school and college tuition (*see* Sealed Ex. 2, PSR ¶¶ 33-34), a Sweet 16 party for 13 people (*see* Sealed Ex. 3), an $8,400 high school graduation party (PSR ¶ 22), a MacBook laptop for his daughter (PSR ¶ 23), and thousands of dollars in airfare and hotel for Sacco, his wife, and

his son to visit his daughter at college (PSR ¶¶ 30-31).   Presumably, Sacco could have taken out

loans for college tuition or borrowed money from another source, but ultimately chose to rely on

gifts from Individual B and Company B to fund his daughter's education.   It was not as if the

payouts from Individual B and Company B went solely for necessities to keep the Sacco family

financially afloat.   Rather, Sacco appears to have counted on the payouts so he could live the

lifestyle he wanted, regardless of his opioid addiction.   Still further, as Sacco acknowledges, the

payouts allowed Sacco to hide his relapse more effectively and therefore likely to prolong it.

*See* Def. Memo. at 15.   Rather than the relapse causing the payouts, the payouts actually served

to exacerbate the relapse.

## III.   Application of Factors Under 18 U.S.C. § 3553(a)

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient,

but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this

subsection," and then sets forth seven specific considerations:

(1)     the nature and circumstances of the offense and the history and
        characteristics of the defendant;
(2)     the need for the sentence imposed—
        (A)     to reflect the seriousness of the offense, to promote respect
                for the law, and to provide just punishment for the offense;
        (B)     to afford adequate deterrence to criminal conduct;
        (C)     to protect the public from further crimes of the defendant;
                and
        (D)     to provide the defendant with needed educational or vocational
                training, medical care, or other correctional treatment in the most
                effective manner;
(3)     the kinds of sentences available;
(4)     the kinds of sentence and the sentencing range established [in the
        Sentencing Guidelines];
(5)     any pertinent policy statement [issued by the Sentencing Commission];
(6)     the need to avoid unwarranted sentence disparities among defendants with
        similar records who have been found guilty of similar conduct; and
(7)     the need to provide restitution to any victims of the offense.

In this case, the Court's sentence should promote general deterrence, reflect the seriousness of the crime, provide just punishment, and promote respect for the law. The government recommends a Guidelines sentence of 8 to 14 months because it would be just, appropriate, and "sufficient, but not greater than necessary, to comply with [§ 3553(a)'s] purposes."

### A. The Court's Sentence Must Reflect the Seriousness of Sacco's Conduct.

This is a consequential crime that warrants a consequential sentence. Sacco conspired with Individual B to defraud Sacco's employer, a mechanical contractor, of tens of thousands of dollars by manipulating internal paperwork and controls to pay Company B money that it was not entitled to get. In its design, this crime was deceitful and required skill and insider knowledge of Sacco's company. *See, e.g.*, PSR ¶ 16 (Sacco informing Individual B that he would be "sitting down to process the c/o and I'll tuck [the $8,750 Sacco was asking from Individual B] in there"); PSR ¶ 21 (Sacco to Individual B: "here's info need a check cut for 8,400.00 I know it's steep I can cover more in fit outs, shitty thing is I need it soon"). Sacco and Individual B engaged in this scheme so they could defray some of the costs of the $200,000 stream of payments to Sacco; in other words, so that someone other than Individual B and Company B bore the costs of Sacco's greed.[2] The impact on the crime victim here is no different than an outright embezzlement of funds. If anything, Sacco's crime is more serious than that of an insider embezzler because he conspired with an outsider to commit the fraud. Given the gravity of the crime, a Guidelines sentence is appropriate.

---

[2] To be sure, Individual B obtained nonmonetary benefits from making these payments to Sacco, who was a project manager as an important client for Company B. *See, e.g.*, PSR ¶ 13.

**B.** **_The Importance of General Deterrence in Construction Fraud Cases._**

A Guidelines sentence is also necessary in this case to provide even a modicum of general deterrence.   The common public perception—if not the reality—is that payoffs, kickbacks, overcharges, and fraud are routine in the construction industry.   *See, e.g.*, Ronald J. Daigle & Dwayne N. McSwain, Building a Better Foundation Against Occupational Fraud in Construction, Construction Accounting and Taxation (July/August 2021), 2021 WL 3639626 ("[O]ccupational fraud is unfortunately a common problem in the construction industry.")   However, these crimes are also difficult to investigate and prosecute.   Indeed, this case came about as an offshoot of a broader bid-rigging investigation.   PSR ¶ 7.   One reason why kickbacks and under-the-table payments may be a recurring practice in the construction industry is because wrongdoers like Sacco think they can get away with it, rationalize that others in the industry engage in it as well so it is somehow okay for them to do it, or think they will not be held accountable in a meaningful way.   For all of those reasons, it is important that any sentence by this Court serves as a general deterrent to other William Saccos who are eliciting and getting secret payments from contracting parties and passing the bill onto others, whether it is a subcontractor, employer, or customer.   A non-incarceratory sentence, however, would not advance this § 3553(a) goal, but rather reinforce the perception that these crimes are not serious, that people who are convicted of such crimes are not meaningfully held accountable, and that these cases are unworthy of a federal court's time and attention.   Such a tacit signal that change order schemes are not serious, however, should be rejected firmly by this Court.

***C.*** ***Sacco's Personal History and Characteristics is But One Consideration Under***
*§ 3553(a).*

Sacco spends the majority of his sentencing memo discussing his background and personal history.   It is clear from the many heartfelt and moving letters Sacco submitted to the Court that he is a caring and devoted father, husband, friend, and colleague.   Notwithstanding all those personal qualities and all of that support, however, Sacco still engaged in serious criminal conduct.   He defrauded his employer through trickery so that he could benefit himself. To the extent he is attributing the cause of his conduct as his opioid addiction, the Court should consider the broader history of Sacco's financial motivations discussed in Section I.A, *supra.*

While the government is not advocating that Sacco's personal circumstances should be used against him at sentencing, they also should not—in and of themselves—negate all the other factors under § 3553(a).   Just as Sacco would presumably not want the Court to focus exclusively on the § 3553(a) factor of the "seriousness of the offense" or "promot[ing] respect for the law" or "provid[ing] just punishment" in his sentencing at the exclusion of his personal characteristics, so too should the Court not unduly weigh the "history and characteristics of the defendant" in the context of *all* the other § 3553(a) factors.

Even if the Court were inclined to do so, there is nothing so extraordinary or unusual about Sacco's personal history or circumstances that would warrant a variance or departure from the Guidelines or similar consideration under § 3553(a).   Sacco grew up in a loving, stable, and close-knit family, and lived an upper-middle-class life.   *See* PSR ¶ 118.   He had a stable, six-figure job that he was good at and appeared to enjoy.   Given the widespread reach of the opioid epidemic, the Court knows very well that many individuals and families have struggled with or

felt the impact of substance abuse.   But the vast majority of the citizenry do not commit fraud in

response, much less engage in a conspiracy with others to do so.   Rather than work an extra job,

get a loan, borrow money from family and friends, cut costs, or incur legitimate debt—which is

what most people do when they face financial hardship—Sacco decided to cut corners and cheat

his way to get money he did not earn and that was not his.   In that context, a probationary

sentence would not promote respect for the law or provide just punishment, as 18 U.S.C. §

3553(a) requires.

D.      *The Court Should Consider the Potentially Significant Impact of the First Step*
        *Act's Provisions for FSA Time Credits in Sentencing.*

As the Court is well aware, Congress enacted the First Step Act ("FSA") in December

2018.   As the BOP has publicly acknowledged, "the FSA has been the most impactful

congressional action taken concerning the Bureau of Prisons in recent years, requiring major

changes to existing systems and processes, the development of new systems, and changes that

apply to approximately 130,000 current inmates."   87 FR at 2707.   Title I of the FSA aimed to

reduce recidivism by providing inmates access to "evidence-based recidivism reduction

programs" and other "productive activities" and affording time credits to eligible inmates who

participate in such programs and activities to reduce their time served in prison and to receive

other benefits.[3]   Under 18 U.S.C. § 3632(d)(4)(A), an eligible inmate who successfully

completes such programming or activities "shall" earn "10 days of time credits for every 30 days

---

[3] Certain inmates are ineligible to receive FSA time credits if they have a conviction for
certain offenses.   *See* 18 U.S.C. § 3632(d)(4)(D).   Generally, the disqualifying offenses involve
crimes that are violent offenses, terrorism, espionage, human trafficking, crimes of sexual
exploitation, repeat felon in possession of a firearm, and high-level drug offenses.   Inmates with
a final order of removal under immigration laws are also ineligible.   18 U.S.C. § 3632(d)(4)(E).

of successful participation" and, for prisoners BOP deems to be a minimum or low risk of recidivism, an additional 5 days of time credits for every 30 days of successful participation.[4] Such time credits may be applied to transfer an inmate in the minimum or low risk tier to home confinement or community confinement during what would otherwise be the final period of incarceration, or to release such an inmate to supervised release 12 months before the end of the term of imprisonment.   28 CFR § 523.44.

The Bureau of Prisons issued a final rule, *see* 28 CFR Parts 523 & 541, effective January 19, 2022, that defined Evidence-Based Recidivism Reduction (EBRR) Programs as:

> a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison.   EBRR Programs may include, but are not limited to, those involved the following types of activities:
> (1) Social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;
> (2) Family relationship building, structured parent-child interaction, and parenting skills;
> (3) Classes on morals or ethics;
> (4) Academic classes;
> (5) Cognitive behavioral treatment;
> (6) Mentoring;
> (7) Substance abuse treatment;
> (8) Vocational training;
> (9) Faith-based classes or services;

---

[4] Under the Rule, a "day" of successful participation is any successful participation on a given day.   The final Rule abandoned the draft proposed definition that a "day" was an 8-hour period of programming or activity.   *See* 87 FR at 2706-07.   Moreover, under the final rule, it is not necessary that the inmate successfully *completes* the programming.   *See* 87 FR at 2711. Nor does the inmate even have to actually participate in the programming or activity if there are "[t]emporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation."   28 CFR § 523.41(b).   As the final rule itself explains, "temporary interruptions in participation that are unrelated to an inmate's refusal or other violation of programming requirements, such as the unavailability of a recommended program or activity or its full enrollment, or interruptions authorized by the Bureau, will not affect the inmate's ability to earn Time Credits."   87 FR at 2711.

(10) Civic engagement and reintegrative community services;
(11) Inmate work and employment opportunities;
(12) Victim impact classes or other restorative justice programs; and
(13) Trauma counseling and trauma-informed support programs.

28 CFR § 523.41(a).   Furthermore, "Productive Activity (PA)" is defined as "a group or individual activity that allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating."   28 CFR § 523.41(b).[5]   While the programming must be recommended by BOP for a particular eligible inmate's needs (and includes well-established programs like RDAP), BOP has approved a wide swathe of available programming, including programs on literacy, post-secondary education, ESL education, vocational training, healthy lifestyle, financial planning, and chronic disease management, among others, as well as work in UNICOR.   *See* First Step Act Approved Programs Guide (February 2021), available at https://www.bop.gov/inmates/fsa/docs/2021_fsa_program_guide.pdf.   Finally, inmates are eligible for FSA time credits in addition to good time credit available under 18 U.S.C. § 3624(b) and any other incentives or rewards.   *See* 18 U.S.C. § 3632(d)(6).

In light of the availability of FSA time credits and the potential significant impact on the sentence a defendant actually serves (i.e., an additional 33% to 50% credit on prison time), the Court should carefully consider the availability of such reductions as it would with good time credit, sentencing reductions based on RDAP participation, and similar BOP rules and regulations.   Such consideration is particularly worthy in this case, where Sacco has no prior

---

[5]   Although the rule was not effective until January 19, 2022, BOP permitted eligible inmates to earn FSA time credits beginning December 21, 2018, when the FSA was enacted.   87 FR at 2708.

convictions, would presumably be classified by BOP as a low risk of recidivism, and would also

have no reason not to take advantage of such programming (even if there were no time credit

incentives).[6]

### E. The Court Must Order Restitution to the Victim of Sacco's Crime.

Restitution is mandatory in this case.   18 U.S.C. § 3663A (requiring restitution when

crime involves fraud or deceit); PSR ¶ 103.   Sacco agreed in his plea agreement to pay

restitution in the amount of $41,195.85 on or before sentencing and the government confirms

that the restitution has been paid in full to the Clerk's Office.   Plea Agmt. at 2.   As the PSR

notes, the government conducted additional investigation to identify the victim(s) that sustained

the actual loss.   Based on that further work, which occurred after the change of plea hearing, the

government concluded that Sacco's former employer, and not any upstream general contractor or

project owner, was the only victim.   The government notified all potential victims of its

conclusion and did not receive any objections.   Accordingly, the Court should order that the full

amount of restitution, $41,195.85, be paid to Sacco's former employer.

### CONCLUSION

In the government's view, Sacco committed this crime because he thought he would not

get caught or, if he did, there would be no real consequences.   A Guidelines sentence here

---

[6] The government is mindful of the Court's obligation to avoid unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6).   As the Court is well aware and as reflected in the PSR, Sacco's case arose out of a broader investigation by the Department of Justice's Antitrust Division and the U.S. Attorney's Office into bid-rigging among insulation contractors in New England.   Although § 3553(a)'s mandate applies to avoiding disparities on a nationwide level as opposed to District- or case-specific disparities, *see United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018), the government views Sacco as less culpable than Don Richards, who was charged separately in 3:21CR72 (KAD), as well as all of the defendants charged in the larger bid-rigging conspiracy.

would provide meaningful punishment to Sacco, deterrence to others, and acknowledgment of impact the crime had on Sacco's victim.   For these reasons and the reasons stated above, the Court should impose a Guidelines sentence of 8 to 14 months and $41,195.85 in restitution to be paid to Sacco's former employer.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

  /s/ David T. Huang
DAVID T. HUANG
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct30434
157 Church Street, 25th Floor
New Haven, CT 06510
Tel.: (203) 821-3700
Fax: (203) 773-5378

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2022, a copy of the foregoing GOVERNMENT'S SENTENCING MEMORANDUM was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.   In addition, a copy of the foregoing was e-mailed to:

Christina Fawcett Moronta, United States Probation Officer

_____/s/_____
DAVID T. HUANG
ASSISTANT U.S. ATTORNEY